# EXHIBIT D

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life   )
Term Parole Consideration   )          CDC Number D-94153
Hearing of:                 )
                            )
SIMEON LUJAO                )
_____ )


CORRECTIONAL TRAINING FACILITY, SOLEDAD

SOLEDAD, CALIFORNIA

SEPTEMBER 5, 2006


PANEL PRESENT:

Mr. Michael Porter, Presiding Commissioner
Ms. D.H. McBean, Deputy Commissioner

OTHERS PRESENT:

Mr. Simeon Lujao, Inmate
Ms. Marsha Hurst, Attorney for Inmate
Two Correctional Officers, Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No         See Review of Hearing
_____   Yes        Transcript Memorandum


SUSAN R. SHABAZZ-PARRISH        Vine, McKinnon & Hall

ii

INDEX

Page

Proceedings.......................................  1

Case Factors......................................  7

Pre-Commitment Factors............................  8

Post-Commitment Factors........................... 10

Parole Plans...................................... 21

Closing Statements................................ 25

Recess............................................ 28

Decision.......................................... 29

Adjournment....................................... 34

Transcriber Certification......................... 35

--oOo--

1

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **PRESIDING COMMISSIONER PORTER:**  Good afternoon, sir. |
| 3 | **INMATE LUJAO:**  Hi, good afternoon to you, too. |
| 4 | **DEPUTY COMMISSIONER MCBEAN:**  Okay, we are on record. |
| 5 | **PRESIDING COMMISSIONER PORTER:**  Okay, this is a |
| 6 | Subsequent Parole Consideration Hearing for Simeon Luha - |
| 7 | - |
| 8 | **INMATE LUJAO:**  Lujao. |
| 9 | **PRESIDING COMMISSIONER PORTER:**  Lujao, CDC number D- |
| 10 | as in David, 94153.  Today's date is September 5th, 2006. |
| 11 | We are located at the Correctional Training Facility, |
| 12 | Soledad.  The inmate was received on 9/2/1988 from San |
| 13 | Benito County.  The life term began on 9/2/1988.  The |
| 14 | minimum eligible parole date is 1/5/1998.  The |
| 15 | controlling offense for which the inmate has been |
| 16 | committed is murder second degree, case number 3049, |
| 17 | count one Penal Code Section 187.  The inmate received a |
| 18 | term of 15 years to life with a minimum eligible parole |
| 19 | date of 1/5/1998.  This hearing is being tape recorded |
| 20 | and for the purposes of voice identification each of us |
| 21 | will say our own first and last name, and spell our last |
| 22 | name.  And when it comes to you, Mr. Lujao, give us your |
| 23 | CDC number after you spell your last name.  I will start |
| 24 | with myself and go to my left.  Michael Porter, P-O-R-T- |
| 25 | E-R, Commissioner. |
| 26 | **DEPUTY COMMISSIONER MCBEAN:**  My name is D.H. McBean, |
| 27 | M-C-B-E-A-N, Deputy Commissioner. |

2

1      **ATTORNEY HURST:**  My name is Marsha Hurst, H-U-R-S-T,

2      counsel for Mr. Lujao.

3      **INMATE LUJAO:**  Hi, my name is Inmate Simeon Lujao,

4      Junior, D-94153.

5      **PRESIDING COMMISSIONER PORTER:**  And for the record

6      we do have two correctional officers present that will

7      not be participating in the hearing.  They are here for

8      security purposes.  Before we begin, Mr. Lujao, can you

9      please read out loud the ADA Statement in front of you,

10     sir?

11     **INMATE LUJAO:**  ADA, American with a Disability Act.

12             "The Americans without, with Disability Act, ADA ,

13             is a law to help people with disabilities.

14             Disabilities are problems that make it harder for

15             some people to see, hear, breathe, talk, walk,

16             learn, think, work or take care of themselves than

17             it is for others.  Nobody can be keep out of public

18             places or activities because of disability.  If you

19             have a disability, you have the right to ask for

20             help to get ready for your BPT hearing, get in to

21             the hearing, talk, read forms and papers and

22             understand the hearing process.  BPT will look at

23             what you asked for to make sure that you have a

24             disability that is covered by the ADA, and that you

25             have asked for the right kind of help.  If you do

26             not get help or if you don't think you, you got the

27             kind of help you need, ask for a BPT 1074 Grievance

3

1        Form.  You can also get help to fill it out."

2        **PRESIDING COMMISSIONER PORTER:**  Thank you, sir.  The

3    record reflects that you signed the BPT 1073 Form on

4    2/16/2006 indicating that you do not have a disability as

5    defined under the Americans With Disabilities Act.  Is

6    that true, sir?

7        **INMATE LUJAO:**  Yes, Sir.

8        **PRESIDING COMMISSIONER PORTER:**  Is that information

9    still correct?

10       **INMATE LUJAO:**  That's right.

11       **PRESIDING COMMISSIONER PORTER:**  Okay, did you have

12   any problems walking up the steps getting here?

13       **INMATE LUJAO:**  No.

14       **PRESIDING COMMISSIONER PORTER:**  I see you have

15   glasses on, are you able to read and see okay with those

16   glasses?

17       **INMATE LUJAO:**  Yeah, I don't think --

18       **PRESIDING COMMISSIONER PORTER:**  Do you have any type

19   of hearing impairment?

20       **INMATE LUJAO:**  Uh -- no.

21       **PRESIDING COMMISSIONER PORTER:**  Have you ever been

22   included in the Triple CMS or EOP Programs.

23       **INMATE LUJAO:**  No.

24       **PRESIDING COMMISSIONER PORTER:**  Do you know what

25   those terms mean?

26       **INMATE LUJAO:**  I don't.

27       **PRESIDING COMMISSIONER PORTER:**  Okay, have you ever

4

1   taken any type of medication, either in prison or on the

2   street for mental health?

3       **INMATE LUJAO:**  No.

4       **PRESIDING COMMISSIONER PORTER:**  Okay, and finally,

5   do you have any disability that would prevent you from

6   participating in today's hearing?

7       **INMATE LUJAO:**  No.

8       **PRESIDING COMMISSIONER PORTER:**  Counsel, are there

9   any ADA issues that you believe need further discussion

10  regarding your client's ability to fully participate in

11  today's hearing?

12      **ATTORNEY HURST:**  No, there are none.

13      **PRESIDING COMMISSIONER PORTER:**  Okay, let's get

14  started.  This hearing is being conducted pursuant to the

15  Penal Code and the Rules and Regulations of the Board of

16  Parole Hearings governing Parole Consideration Hearings

17  for life inmates.  The purpose of today's hearing is to

18  once again consider your suitability for parole.  In

19  doing so, we will consider the number and nature of the

20  crimes for which you were committed, your prior criminal

21  and social history, your behavior and programming since

22  your commitment, and your plans if released.  We have had

23  the opportunity to review your Central File.  You will be

24  given the opportunity to correct or clarify the record.

25  We will consider your progress since your commitment,

26  your counselor's reports, and your mental health

27  evaluations.  We will focus on your progress and any new

5

1    reports since our last hearing.  Any change in Parole

2    Plans should be brought to our attention.  We will reach

3    a decision today and inform you whether or not we find

4    you suitable for parole and the reasons for our decision.

5    If you are found suitable for parole, the length of your

6    confinement will be explained to you.  Before we recess

7    for deliberations, the district, scratch that -- your

8    attorney and you will be given the opportunity to make a

9    final statement regarding your parole suitability.  Your

10   statement shall be limited to why you feel you are

11   suitable for parole.  We will then recess, clear the

12   room, and deliberate.  Once we have completed our

13   deliberations, we will resume the hearing and announce

14   our decision.  The California Code of Regulations states

15   that regardless of time served a life inmate shall be

16   found unsuitable for and denied parole if in the judgment

17   of the Panel the inmate would pose an unreasonable risk

18   of danger to society if released from prison.  You have

19   certain rights.  Those rights include the right to a

20   timely notice of this hearing, a right to review your

21   Central File, and the right to present relevant

22   documents.  Counsel, have your client's rights been met?

23       **ATTORNEY HURST:**  They have, yes.

24       **PRESIDING COMMISSIONER PORTER:**  Thank you, ma'am.

25   And, sir, you have an additional right to be heard by an

26   impartial Panel.  We are your Panel.  Do you have any

27   objection to us?

6

1      **INMATE LUJAO:**  No, not right now.

2      **PRESIDING COMMISSIONER PORTER:**  You will receive a

3   copy of our written Tentative Decision today.  That

4   Decision becomes final within 120 days.  A copy of that

5   Decision and a copy of the transcript will be sent to

6   you.  On May 1st, 2004 the regulation regarding the right

7   to appeal a Decision made at this hearing were repealed.

8   The current policy is entitled Administrative Appeals,

9   Correspondence, and Grievances Concerning Board of Prison

10  Terms Decision.  You can consult with your attorney for

11  more information or you can review the policy right here

12  at the Prison Law Library.  You are not required to admit

13  to or discuss your offense.  However, this Panel does

14  accept as true the findings of the Court.  Do you

15  understand that, sir?

16     **INMATE LUJAO:**  Yes.

17     **PRESIDING COMMISSIONER PORTER:**  Deputy Commissioner

18  McBean, do we have any confidential information, ma'am?

19     **DEPUTY COMMISSIONER MCBEAN:**  No, we don't.

20     **PRESIDING COMMISSIONER PORTER:**  Okay, I have a

21  Hearing Checklist.  I am going to mark it Exhibit one,

22  and give it to counsel, and make sure we are all

23  operating off the same set of documents.  Will you give

24  that to counsel, sir?  Thank you.

25     **ATTORNEY HURST:**  Yes, I do have all the documents.

26  Thank you.  And in addition, there is a new Psych

27  Evaluation as well.

7

1      **PRESIDING COMMISSIONER PORTER:**  Okay.  Thank you,

2    ma'am.  Thank you.

3      **ATTORNEY HURST:**  Uh-huh.

4      **PRESIDING COMMISSIONER PORTER:**  And, counsel, do you

5    have any additional documents to be submitted?

6      **ATTORNEY HURST:**  No, there are none.

7      **PRESIDING COMMISSIONER PORTER:**  Counsel, do you have

8    any preliminary objections?

9      **ATTORNEY HURST:**  No.

10      **PRESIDING COMMISSIONER PORTER:**  Counsel, will your

11    client be addressing the Panel today?

12      **ATTORNEY HURST:**  He will, but not as to the facts

13    and circumstances of the life crime.

14      **PRESIDING COMMISSIONER PORTER:**  Okay.  Mr. Lujao,

15    since you will be addressing the Panel we need to swear

16    you in, sir.  So -- please raise your right hand.  Do you

17    solemnly swear or affirm that the testimony you give at

18    this hearing will be the truth, the whole truth, and

19    nothing but the truth?

20      **INMATE LUJAO:**  Yes, Sir.

21      **PRESIDING COMMISSIONER PORTER:**  Okay, thank you,

22    sir.  I am going to read into the record the Statement of

23    Facts, which is a summary of the crime which is located

24    at the February 2004 Board Report, if you have no

25    objections, counsel?

26      **ATTORNEY HURST:**  No objections.

27      **PRESIDING COMMISSIONER PORTER:**  On February 6, 1988

8

1    at approximately 9:00 p.m. deputies responded to a

2    reported attempted murder which had occurred on Highway

3    101 within the county boundaries.  After arriving at the

4    scene, deputies contacted witness Lowell Ronolo, R-O-N-O-

5    L-O, who told deputies that while he was driving towards

6    San Jose, Simeon Lujao attacked a passenger in the

7    vehicle, Arturo Vasaya, V-A-S-A-Y-A, with a knife.  Lujao

8    was arrested at the scene without incident.  Officers

9    noted Lujao was covered with blood and he had a bloody

10   knife in his possession.  The victim died at the scene of

11   the offense.  The cause of death were multiple stab

12   wounds.  So, okay, since we are not going to discuss the

13   life offense, we will go on to some Pre-Conviction

14   Factors.  As a juvenile, we don't have any juvenile

15   record for you.  And as for adult convictions besides

16   there is a hold for a 187 and -- and besides this crime

17   we don't have any other convictions concerning you.  Are

18   you, counsel, is he willing to discuss the 187 that he's

19   got a hold for --

20          **ATTORNEY HURST:**  I believe he is, yes.

21          **PRESIDING COMMISSIONER PORTER:**  -- in the

22   Philippines?

23          **INMATE LUJAO:**  I already did discuss at a prior --

24   my previous hearing.  So I don't want to discuss that one

25   here.

26          **PRESIDING COMMISSIONER PORTER:**  You don't want to

27   discuss it, okay.  All right.  And we will move on to

1   some Personal Factors.  And are you willing to discuss

2   personal factors?  Some of your personal history?

3       **INMATE LUJAO:**  Uh -- no, I (inaudible).

4       **PRESIDING COMMISSIONER PORTER:**  Okay, all right, I

5   will just read from the record some -- some things that

6   we have here.  Lujao is the oldest of 11 children.  His,

7   including his parents and family reside in the

8   Philippines.  I think that's a misprint.  And so

9   basically you were born and raised in the Philippines.

10  He went to college and earned a teaching certificate, but

11  never became a teacher.  He preferred instead to collect

12  money for a bus company.  This company later went

13  bankrupt.  Lujao eventually owned and operated a bakery.

14  Eventually he became involved in politics and became an

15  influential member of the Mayor's Office.  When he became

16  a member of the Mayor's Office he sometimes would stay --

17  would stand in for the mayor.  The mayor trusted him and

18  allowed Lujao to become administrator of a bus company.

19  The mayor eventually became a congressman and Lujao --

20  Lujao's involvement increased.  He accompanied the

21  congressman on extended trips and vacations.  When the

22  congressman's son enrolled in college, Lujao was expected

23  out of loyalty to be his housemate and take care of the

24  son's needs -- needs while he was in college in

25  Sacramento.  The congressman's family persuaded Lujao to

26  stay in California to provide for their son.  In doing

27  so, he violated his visa status and became an illegal

10

1    alien.  This depressed Lujao because he did not know when

2    or how he was going to get to his family in the

3    Philippines.  So we are going to change gears and go to

4    some Post-Conviction Factors with Deputy Commissioner

5    McBean.

6        **DEPUTY COMMISSIONER MCBEAN:**  Okay, Mr. Lujao, in

7    this phase of the hearing we will be addressing

8    institutional adjustment.  I have reviewed the Central

9    File, the Board Report, the Psych Evaluation, and if I

10   miss anything, I will be given you and your attorney an

11   opportunity to add some things.  Okay, you last appeared

12   before the Board on 6/2/04. At that time you were given a

13   two year denial.  You were asked to get self-help, to

14   stay disciplinary free, and to learn a trade.  You have a

15   current classification score of 19.  Your custody level

16   is Medium A.  From a work assignment standpoint, you have

17   been working in PIA since May of '93 -- and generally

18   have above average work reports.  You did have a -- one

19   chrono in there in May of '02 through about three of four

20   months where the file indicates you had a poor work

21   report for some reason, but overall, over the last 11 or

22   12 years you have had above average work reports, and

23   you're doing well in PIA, and you are still assigned

24   there.  Is that correct?

25       **INMATE LUJAO:**  Yes.

26       **DEPUTY COMMISSIONER MCBEAN:**  Okay, you do have a

27   TABE score of 5.9.  However, the -- we do have a

11

1    transcript in the file indicating that you did acquire a

2    college degree in your country, and that's a B.S. in

3    Elementary Education.  Is that correct?

4        **INMATE LUJAO:**  Yes.

5        **DEPUTY COMMISSIONER MCBEAN:**  In the Philippines?

6        **INMATE LUJAO:**  Yes.

7        **DEPUTY COMMISSIONER MCBEAN:**  Okay.  So you have not

8    participated in any vocational trades here then, during

9    your incarceration other than the PIA, is that correct?

10       **INMATE LUJAO:**  Yes.

11       **DEPUTY COMMISSIONER MCBEAN:**  Okay.  Why is your TABE

12   score so low, 5.9, do you know?

13   [Thereupon, the foreign accent of the inmate resulted in

14   excessive inaudibles].

15       **INMATE LUJAO:**  I was so depressed at that time,

16   about four years when I got this (inaudible).

17       **DEPUTY COMMISSIONER MCBEAN:**  Uh-huh.

18       **INMATE LUJAO:**  (inaudible).  I couldn't think.

19       **DEPUTY COMMISSIONER MCBEAN:**  You didn't try very

20   hard?

21       **INMATE LUJAO:**  Not no longer, just real depressed at

22   that time.

23       **DEPUTY COMMISSIONER MCBEAN:**  Uh-huh.  All right.

24       **INMATE LUJAO:**  I mean, the first four years in

25   prison is (inaudible).

26       **DEPUTY COMMISSIONER MCBEAN:**  All right.  Yeah, I'm

27   not sure when that TABE test was.  All right, it was in

12

1    1989.  You may want to consider taking it again, just

2    because it -- it doesn't sort of add up, you know.  Most

3    people who have a college degree would get the highest

4    score on their TABE -- TABE score, a 12.9.

5         **INMATE LUJAO:**  Oh.

6         **DEPUTY COMMISSIONER MCBEAN:**  Just a suggestion.  It

7    may -- it may not make any difference in PIA, does it?

8    Does it make any difference to you in PIA?

9         **INMATE LUJAO:**  I don't know.

10        **DEPUTY COMMISSIONER MCBEAN:**  Does it -- would it

11   give you an opportunity to do other things within PIA if

12   your TABE score was higher?

13        **INMATE LUJAO:**  I don't know.  I assumed that it

14   didn't.

15        **DEPUTY COMMISSIONER MCBEAN:**  In many of the

16   vocational trades, it does make a difference.  It -- it

17   matters in terms of what you are eligible to participate

18   in, should you choose to upgrade vocationally and get out

19   of PIA some day, so, just for your information.  Now,

20   from a self-help standpoint, you participated in

21   successful re-entry, a 3-hour video on 11/7/03.  Live

22   Skills for 10 weeks in '98.  And Breaking Barriers in

23   '91.  Since your last appearance then on 6/2/04, I didn't

24   see any additional participation in any kind of self-

25   help.  Have you participated in anything at all in the

26   last couple of years?

27        **INMATE LUJAO:**  No.

13

1      **DEPUTY COMMISSIONER MCBEAN:**  Okay.  And why is that?

2      **INMATE LUJAO:**  I have been (inaudible) my self-help.

3  I don't really need any self-help at this time

4  (inaudible) totally.  And I am in control of myself, and

5  I know what I am doing so, I don't really need it for

6  myself.

7      **DEPUTY COMMISSIONER MCBEAN:**  Hum.

8      **INMATE LUJAO:**  Presently, I'm being, going back to

9  Philippines.  All those trades I can't use it over there.

10  I know they (inaudible).  So when I go back there, I

11  don't need, well, need, not too many people hire me if I

12  want to, if I want work.  So --

13      **DEPUTY COMMISSIONER MCBEAN:**  Well, how will you

14  support yourself?

15      **INMATE LUJAO:**  I keep my, my (inaudible) they still

16  got their own business there (inaudible).  This is there

17  that we can live and we can survive like an individual

18  person living over there.  So I guess we're (inaudible).

19      **DEPUTY COMMISSIONER MCBEAN:**  So you would count on

20  your children to support you?

21      **INMATE LUJAO:**  Yes, because I still have my, my

22  business over there.  My, my younger brother is the one

23  running it.

24      **DEPUTY COMMISSIONER MCBEAN:**  Your bakery?

25      **INMATE LUJAO:**  Uh -- (inaudible).

26      **DEPUTY COMMISSIONER MCBEAN:**  But the -- the problem

27  I have is that -- and I -- I looked back, and I know that

14

1    I sat on your Panel the last time, and I specifically

2    reminded you how important it is to participate in self-

3    help.  And so, I've looked at all the other transcripts

4    and Decisions and every Panel you have ever appeared

5    before has told you the same thing.  And yet, you have

6    steadfastly chosen not to participate, especially of

7    late.  I mean, Life Skills was good, it was 10-weeks

8    long.  It was in '98 though.  And what is especially

9    missing in your self-help, given the nature of your

10   commitment offense, wherein even you have admitted in the

11   past that you were in a rage, and very angry -- that you

12   haven't -- have you ever done any kind of Anger

13   Management?

14        **INMATE LUJAO:**  I did start it for when I was in

15   North for about four or five weeks.

16        **DEPUTY COMMISSIONER MCBEAN:**  Okay.

17        **INMATE LUJAO:**  Then when I was transferred in the

18   North, no, (inaudible) is the reason why I wasn't able to

19   finish that.

20        **DEPUTY COMMISSIONER MCBEAN:**  When was that?

21        **INMATE LUJAO:**  That was -- uh -- 2000, 2002.

22        **DEPUTY COMMISSIONER MCBEAN:**  Right.

23        **INMATE LUJAO:**  (inaudible).

24        **DEPUTY COMMISSIONER MCBEAN:**  Okay, but that's four

25   years ago now.

26        **INMATE LUJAO:**  Yeah.

27        **DEPUTY COMMISSIONER MCBEAN:**  Yeah, do you think it

15

1   might be important for you to participate in some kind of

2   Anger Management?

3       **INMATE LUJAO:**  Uh -- in some other instances

4   (inaudible).  And so I see, I already control my anger

5   and I learn how not to (inaudible) doing hard time in

6   here.  So I have, I put myself in for -- uh -- absolutely

7   self-control of everything.  So any instances that might

8   ruin my second (inaudible) life schedule, so that will be

9   absolutely controlled by myself.

10      **DEPUTY COMMISSIONER MCBEAN:**  Well, you know,

11  frankly, that just doesn't work for the Board.  And

12  you've been told that before.  And also, when we look at

13  your criminal history, you didn't have any criminal

14  history before you stabbed and killed your cousin.  So,

15  and you haven't had any since.  See, we have to make sure

16  that you have tools available to you.  I don't know how

17  you've learned new things other than doing time.  How

18  have you learned how to hang, handle your anger?

19      **INMATE LUJAO:**  Well, I think I do need to explain

20  that more, but, you know, I decline for explain about

21  that (inaudible).  Like I say, that's imperative I learn

22  how to control my anger.

23      **DEPUTY COMMISSIONER MCBEAN:**  What did you say?  You

24  decline to explain how you handle your anger?

25      **INMATE LUJAO:**  Yes.

26      **DEPUTY COMMISSIONER MCBEAN:**  You don't want to

27  discuss it.

16

1    **INMATE LUJAO:**  I don't want to discuss it because I

2    like I say that.  You know, I already how, know how to

3    control it.  So, so anger is only is controlling yourself

4    is how you control your anger.  But you get mad and then

5    you have a self-control with yourself and you can, but

6    it, you can do nothing really.

7    **PRESIDING COMMISSIONER PORTER:**  Do you realize

8    that's what you are in here for, sir?  Because you lost

9    control and stabbed your cousin to death?

10   **INMATE LUJAO:**  That's, that's the right one.

11   **PRESIDING COMMISSIONER PORTER:**  So Anger Management

12   is very important.

13   **INMATE LUJAO:**  Yes.

14   **DEPUTY COMMISSIONER MCBEAN:**  Well, what we are

15   saying is Anger Management training is important for you.

16   You know, everybody gets angry.  I mean, it's not just

17   you.

18   **INMATE LUJAO:**  Yes.

19   **DEPUTY COMMISSIONER MCBEAN:**  But everybody doesn't

20   stab and murder somebody.  You did.  So the Board has to

21   look at that and weigh that.  And, you know, you need to

22   be able to demonstrate some insight and talk about it.

23   Now, you don't have to, but we -- we'll have a hard time

24   assessing it if you don't want to do what the Board has

25   requested or discuss it.  So, we can move on.  You don't

26   have to discuss it, but, it's your hearing.  You know, we

27   want to give you a chance to if -- if you have anything

17

1    else to add.  Do you have anything else to add on that?

2        **INMATE LUJAO:**  No.

3        **DEPUTY COMMISSIONER MCBEAN:**  Okay.  All right, then,

4    let's move on.  You -- you have done well from a

5    disciplinary standpoint.  You don't have any 115's.  You

6    only have one 128, and that's on 10/24/96, and that is

7    for smoking.  All right, let's look at the Psych

8    Evaluation.  Now, your most recent Psych Evaluation is

9    dated 8/10/06 and this is by Dr. Melvin Macombers.  He

10   states, under Review of the Life Crime, that you stabbed

11   your wife's cousin during a political argument.  That you

12   were feeling very depressed.  And it says here, inmate --

13   how it stated that the victim's challenges, as well as

14   his feelings of depression and despair he was

15   experiencing at that time resulted in his exploding and

16   becoming out of control.  He stated that the victim was

17   his friend.  That he did not mean to do what he did.  He

18   stated he responded in rage and anger, and he was out of

19   control at that time.  And he immediately felt deep

20   feelings of sorrow and remorse when he realized what had

21   happened.  The doctor, however, feels that it was quite

22   situational, and that this is not a situation that is

23   likely to ever reoccur, and it states on page three:

24       "Since the time of the commitment offense,

25       18 years ago, Inmate Lujao has grown in

26       maturity, self-awareness, and self-control.

27       He is no longer the same person that he was

18

1    at the time that the commitment offense

2    occurred."

3    Do you agree with that?

4    **INMATE LUJAO:**  Yes.

5    **DEPUTY COMMISSIONER MCBEAN:**  What has changed?

6    **INMATE LUJAO:**  Myself.

7    **DEPUTY COMMISSIONER MCBEAN:**  Uh-huh.

8    **INMATE LUJAO:**  Change of everything.  I know how to

9    handle my anger.  Knows how to control it in here or not,

10    sufficient that give me some problems, some problem is

11    that I can control that.  Most, most likely for almost

12    everything I (inaudible) because I am tired of giving

13    depression for a long time, and this the hardest time my

14    whole life.  Being like this is (inaudible).  And I just

15    (inaudible).

16    **DEPUTY COMMISSIONER MCBEAN:**  Okay, this also

17    indicates that in terms of the commitment offense:

18    "You had political enemies that were falsely

19    accusing him of murder.  The victim had been

20    taunting him and challenging him with the

21    accusation of these false charges.  This

22    situation contributed toward his feelings of

23    anger and rage during the commitment

24    offense.  He stated the charges were

25    politically motivated and are false.  The

26    actual murderer in the Philippines was

27    captured and sent to prison.  He stated as

19

1       soon as he returns to the Philippines he

2       will go to court and charges will be

3       dismissed.  Inmate Lujao's level of

4       understanding and insight into the dynamics

5       of the commitment offense appear to be very

6       good."

7  Let's see, in terms of an assessment of dangerousness,

8  Dr. Macomber says:

9       "If released to the community he poses no

10      more risk to society than the average

11      citizen in the community."

12  And in fact, used a level of service inventory revised

13  actuarial instrument where you scored extremely low risk

14  levels, and in fact, goes on to state even further:

15      "He poses no more risk to society at this

16      point in time than the average citizen in

17      the community and probably poses less risk

18      to society than the average citizen in the

19      community, and is suitable for release.  The

20      prognosis for a successful adjustment in the

21      community in this case is excellent."

22  In looking at the other Psych Evaluations, the one of

23  10/30/03 by Dr. Stewart -- Jay Stewart -- let's see -- on

24  page five he is talking about the predecessors to the

25  crime and -- and that he feared for his life, was fearful

26  of being falsely convicted of murder if returned to the

27  Philippines.  And the doctor says:

20

1         "Even though Inmate Lujao lacks adequate

2         insight into his behavior, he may be

3         educated to increase his awareness of

4         stressors."

5    So he noted there that you had some problems with

6    insight.  Dr. Torini's report, the prior one in 1998

7    notes that Dr. Vayton had recommended one-on-one therapy

8    to address the commitment offense, as he has little

9    insight.  And that he agreed with that.  Did you ever

10   get a chance to do any one-on-one therapy?

11        **INMATE LUJAO:**  No, only last week.

12        **DEPUTY COMMISSIONER MCBEAN:**  Okay, yeah, that's not

13   -- that's not therapy, is it?  Is that therapy?

14        **INMATE LUJAO:**  Sort of.

15        **DEPUTY COMMISSIONER MCBEAN:**  Is it group therapy,

16   led by a psychologist?

17        **INMATE LUJAO:**  Yes.

18        **DEPUTY COMMISSIONER MCBEAN:**  Okay.  Any -- anything

19   beyond that?  Any one-on-one type of --

20        **INMATE LUJAO:**  Uh -- no, because that program is

21   not, into the (inaudible).

22        **DEPUTY COMMISSIONER MCBEAN:**  Yeah.  I know, and

23   it's hard if you are not part of the Triple CMS Program.

24   And then in the report of 1996 by Dr. Bakeman, also

25   indicates on the last page that he does not yet seem to

26   have very good insight into why the commitment offense

27   occurred.  So, it's over the years the doctors have

21

1    encouraged you to do, you know, more therapy so that you

2    could gain some insight. It doesn't look like you've

3    done that since the Life Skills Program in '98.  But

4    this doctor seems to think that you -- that you do have

5    some insight and maturity, self-awareness and self-

6    control.  And the file does indicate you still do have

7    the immigration hold from the Philippines on the murder

8    charge from 1983.  So -- according to the report -- the

9    Psych Evaluation, you feel those charges will be

10   dismissed if you are ever returned.  And I know you said

11   you don't want to discuss it, so.  Was there anything

12   else you wanted to add in terms of your institutional

13   accomplishments?  Anything I may have missed?

14        **INMATE LUJAO:**  No.

15        **DEPUTY COMMISSIONER MCBEAN:**  Okay.  Anything to

16   add, counsel?

17        **ATTORNEY HURST:**  No, I don't think so.

18        **DEPUTY COMMISSIONER MCBEAN:**  Okay, return to the

19   Chair then.

20        **PRESIDING COMMISSIONER PORTER:**  Okay, thank you,

21   ma'am.  Mr. Lujao, if you get paroled, where do you plan

22   on living?

23        **INMATE LUJAO:**  Going back to Philippines to live

24   with my, my brother.

25        **PRESIDING COMMISSIONER PORTER:**  Okay, what city is

26   that?

27        **INMATE LUJAO:**  (Inaudible) City (inaudible).

22

1    **PRESIDING COMMISSIONER PORTER:**  Where?

2    **INMATE LUJAO:**  Philippines.  (Inaudible) City

3    (inaudible).

4    **PRESIDING COMMISSIONER PORTER:**  Okay.  What type of

5    home is it?

6    **INMATE LUJAO:**  Ah -- just a regular home.  Three

7    bedroom house.

8    **PRESIDING COMMISSIONER PORTER:**  Three bedroom?

9    **INMATE LUJAO:**  Yes.

10   **PRESIDING COMMISSIONER PORTER:**  Okay, so you would

11   have your own bedroom?

12   **INMATE LUJAO:**  Yes.

13   **PRESIDING COMMISSIONER PORTER:**  Okay.  Did you

14   happen to check into any self-help programs that might

15   be in the area?

16   **INMATE LUJAO:**  Over there?

17   **PRESIDING COMMISSIONER PORTER:**  Yes.

18   **INMATE LUJAO:**  I don't know where they are at now

19   (inaudible) I've never been over there.

20   **PRESIDING COMMISSIONER PORTER:**  Okay.  All right,

21   and where do you plan on working?  What are you going to

22   do for employment?

23   **INMATE LUJAO:**  Right now I work with -- uh -- my

24   brother's out of my son's bakery.  And -- uh -- the same

25   (inaudible) restaurant.  I try to move forth into these.

26   **PRESIDING COMMISSIONER PORTER:**  Work in the

27   restaurant?

23

1      **INMATE LUJAO:**  Yes.

2      **PRESIDING COMMISSIONER PORTER:**  Doing what?

3      **INMATE LUJAO:**  Yes, I plan.

4      **PRESIDING COMMISSIONER PORTER:**  Doing what?

5      **INMATE LUJAO:**  Management, anything (inaudible)

6      what to do in the business venture.  That's what I am

7      going to do.  Management type.

8      **PRESIDING COMMISSIONER PORTER:**  Management?

9      **INMATE LUJAO:**  Yes.

10     **PRESIDING COMMISSIONER PORTER:**  Okay.  All right,

11     because I -- I was waiting for the letters.  I don't

12     have any updated letters -- as far as where you are

13     going to live or your employment.  Is there a reason for

14     that?

15     **INMATE LUJAO:**  I did have a little bit last time.

16     Last time I got all kind of letter of support.  The

17     Board didn't (inaudible).

18     **PRESIDING COMMISSIONER PORTER:**  Yeah, but each time

19     you have a hearing, it's a whole new  --

20     **INMATE LUJAO:**  Oh.

21     **PRESIDING COMMISSIONER PORTER:**  -- it's a -- you're

22     starting over again.

23     **INMATE LUJAO:**  This time I didn't ask for them.

24     **PRESIDING COMMISSIONER PORTER:**  Okay, because,

25     yeah, because we don't have anything.  And we also --

26     sent out 3042 Notices, and those notices go to agencies

27     having a direct interest in your case, like the District

24

1   Attorney's Office, the Police Department, Sheriff's

2   Department, and there, we didn't get anything from them

3   either.  So, that -- yeah -- we -- each, each year you

4   need to have everything updated and bring in all those

5   letters, especially of residence and employment.  Bring

6   them in so we can take a look at it.  Right now we don't

7   have anything to look at.

8       INMATE LUJAO:  I was (inaudible) the previous.

9   That one -- that's the only letter that was in my file.

10      PRESIDING COMMISSIONER PORTER:  Pardon me?

11      INMATE LUJAO:  About the previously, only letter of

12  support.  I confirm that.

13      PRESIDING COMMISSIONER PORTER:  No, I said each

14  hearing --

15      INMATE LUJAO:  Today.

16      PRESIDING COMMISSIONER PORTER:  -- yes, we need

17  updated information for each hearing.

18      INMATE LUJAO:  Uh-huh.

19      PRESIDING COMMISSIONER PORTER:  Okay, we are going

20  to -- Deputy Commissioner, have you got any questions?

21      DEPUTY COMMISSIONER MCBEAN:  I don't, thank you.

22      PRESIDING COMMISSIONER PORTER:  Okay. And neither

23  do I, so we'll go to counsel, see if she's got any

24  questions of you.

25      ATTORNEY HURST:  No, I don't.

26      PRESIDING COMMISSIONER PORTER:  Okay, well then we

27  will go to counsel for a final statement.

1   **ATTORNEY HURST:**  Okay.  Mr. Lujao has chosen not to
2   discuss the life crime today, although he has in the
3   past.  And I think part of that is it's just very
4   difficult to provide a rational explanation for an
5   irrational act.  And it was committed under extreme
6   stress, and unusual circumstances.  He is certainly not
7   a criminally oriented individual.  He has been a very
8   productive man in his lifetime with -- with pro-social
9   attitude.  I know you are aware from prior reports that
10  there were peripheral issues involved here and that he
11  was unable at that time to return to the Philippines and
12  to his family which was certainly very depressing and
13  frustrating to him.  Since he has been in prison, his
14  programming has been quite exemplary, certainly in terms
15  of disciplinary actions.  There are no 115's at all, so
16  he is clearly able to follow the rules -- stay out of
17  trouble.  Educationally, he came in prison as a college
18  graduate.  Vocationally he has acquired numerous skills,
19  although he has never been in a vocation per se, but he
20  does have generally good work reports and some
21  outstanding work reports, with one exception, as noted
22  during the course of the hearing.  Self-help has not
23  been in -- in this last period of time since the last
24  hearing -- he has not participated in any self-help,
25  although he did make an effort to participate in an
26  Anger Management Program.  But a change of housing
27  interfered with that.  In the past, however, he has

26

1    participated in breaking barriers, life skills, and some

2    video instruction relating to reentry.  The Psych

3    Reports really in the case are most interesting.  The

4    current Psych Report is extremely positive and

5    supportive of release.  In fact, Dr. Macomber just makes

6    a flat statement that in his opinion that he is suitable

7    for parole.  He also notes that at the present time he

8    feels he has good insight into this crime.  There are

9    other reports that were referred to today which do

10   question to some degree his insight.  However, in spite

11   of that, all the reports across time have basically been

12   positive reports and have indicated that he would pose a

13   less than average risk to society.  Dr. Stewart, which I

14   think is the report that you had for the last hearing --

15   does again mention the insight issues and he suggests

16   that they could be appropriately dealt with on an

17   outpatient basis.  So this is kind of an unusual thing

18   that there has been considerable -- there has been more

19   than average unanimity in the Psych Reports, I think.

20   Now, at the time that Mr. Lujao was -- we had -- that

21   his Probation Report was being -- was being prepared, a

22   Psych Evaluation had been ordered at that time, and

23   there is a reference to that on page four of the POR,

24   and it was done by a Dr. Wilcox who found that any

25   problems Mr. Lujao may have were situational.  And aside

26   from remorse for his crime and possible depression, he

27   is probably not suffering any psychological problems at

27

1   this time.  So the commitment offense was certainly an

2   aberration for him, and most of the evaluators seem to

3   feel that it was so situational in nature that he does

4   pose a less than average risk.  Unfortunately, we don't

5   have any documented Parole Plans at this time.  I think

6   for the last hearing he did submit those, and I would

7   like to just go over some of the things that were in

8   those letters.  They are in the C-File, and with respect

9   to job opportunities, he -- he had a job opportunity

10  with his daughter, and I don't have names here because I

11  am not sure I could pronounce some of the names

12  involved.  He also had a -- a letter with a job offer on

13  a pineapple plantation, as he pointed out to you today,

14  and that would be in the area of personnel management.

15  Another opportunity is an airport shuttle driver.  And a

16  letter from an Attorney Joe Lopez, which provides

17  another opportunity as a driver.  In addition to that,

18  he feels it might be possible for him to use his PIA

19  skills as a sewing machine operator.  I understand it is

20  a little bit difficult to make an assessment of just

21  where he is today because of the fact that he has had

22  the, you know, spoken in a limited manner.  But I think,

23  overall there that everyone who has evaluated him,

24  including the -- the counselors at -- when they were

25  allowed to make assessments of dangerousness, has had

26  very positive things to say.  And I ask you to consider

27  all of that.  Thank you.

28

1          **PRESIDING COMMISSIONER PORTER:**  Thank you, ma'am.

2     Mr. Lujao, would you like to make a final statement

3     regarding your suitability for parole?

4          **INMATE LUJAO:**  My counsel stated everything, yes.

5          **PRESIDING COMMISSIONER PORTER:**  Okay, thank you,

6     sir.  We will now recess for deliberations.

7                         **R E C E S S**

8                          --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

29

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER MCBEAN:**  Okay, we are back on

4    record.

5    **PRESIDING COMMISSIONER PORTER:**  Okay, in the matter

6    of Mr. Simeon Lujao, the Panel has reviewed all the

7    information received from the public and relied on the

8    following circumstances in concluding that the prisoner

9    is not suitable for parole and would pose an unreasonable

10   risk of danger to society or a threat to public safety if

11   released from prison.  That is because the offense was

12   carried out in an especially cruel and callous manner.

13   Basically, Mr. Lujao was riding in a vehicle with the

14   driver and the passenger that he was -- Mr. Lujao was

15   seated in the rear seat of the vehicle, and the victim

16   was sitting in the right front seat.  And they got into a

17   discussion and -- about politics which lead to a

18   argument, and Mr. Lujao proceeded to stab him eleven

19   times.  So the crime was definitely carried out in a

20   callous manner.  The offense was carried out in a

21   dispassionate manner.  And the victim was certainly

22   abused during the offense.  Because at one point during

23   the crime the victim even cried out to Mr. Lujao to

24   please, stop stabbing him.  But Mr. Lujao did not find it

25   within him to control himself enough to say, hey, this

26   has gone far enough, let me stop stabbing him.  Let me --

27   **SIMEON LUJAO  D-94153    DECISION PAGE 1   9/5/06**

1  let's stop this car and try to get the man some medical

2  attention.  And, the motive for the crime was very

3  trivial in relation to the offense.  I mean, this man was

4  your cousin.

5      **INMATE LUJAO:**  Cousin of my wife.

6      **PRESIDING COMMISSIONER PORTER:**  Sir, you -- cousin

7  of your wife, but you are not allowed to talk to me in

8  Decision time, sir.  You had your time, okay, don't

9  interrupt, please.  And -- so this man was in a

10  particularly vulnerable position.  He was sitting in the

11  front seat not knowing that he is going to be stabbed.

12  And so he is unarmed, and he had a certain level of trust

13  in you.  So, the prisoner has failed to develop a

14  marketable skill that can be put to use upon release.

15  The prisoner has failed to upgrade vocationally as

16  previously recommended by the Board.  And the prisoner

17  has not sufficiently participated in beneficial self-help

18  and or therapy programs.  Basically there has been very

19  little self-help that you have participated in and none

20  since the last appearance, zero.  There has been no Anger

21  Management, and even in the psychological report, dated

22  August 2006 authored by Ms. -- Dr. Zika, Z-I-K-A -- no

23  correction Dr. Macomber, M-A-C-O-M-B-E-R -- I -- he poses

24  you at no more risk to society than the average citizen

25  in the community, and -- and -- and I think that is

26  inconclusive because it doesn't really deal with insight.

27  **SIMEON LUJAO  D-94153   DECISION PAGE 2   9/5/06**

31

1    And this goes back to your Anger Management.  It states

2    in review of the life crime, that -- a portion of it

3    states that feelings of depression and despair he was

4    experiencing at the time resulted in his exploding and

5    becoming out of control.  And skip a sentence and go down

6    one later it states that, he stated that he responded in

7    rage and anger and was out of control at the time.  And

8    the psychological report before that one, dated 2003 --

9    and that was by Dr. Stewart -- and in review of the life

10   crime, the last paragraph -- and the first sentence says,

11   Inmate Lujao is bewildered as to why he lost control,

12   killing someone who was a friend.  And then it states,

13   "he asked me to stop," that's your quote.  "I was out of

14   control."  So, and to hear you say that you -- you don't

15   really need Anger Management, that you've got yourself

16   under control, sir, I beg to differ with you.  And we

17   need to have confidence in you to know -- you need to

18   prove to us that you've gotten yourself under control.

19       **DEPUTY COMMISSIONER MCBEAN:**  Excuse me and let me

20   turn the tape.

21       **PRESIDING COMMISSIONER PORTER:**  Okay.

22   [Thereupon, the tape was turned over.]

23       **DEPUTY COMMISSIONER MCBEAN:**  Okay, back on record.

24       **PRESIDING COMMISSIONER PORTER:**  Okay, and,

25   nevertheless, you should be commended for the -- your

26   good things you have done.  You have not had any 115's

27   **SIMEON LUJAO   D-94153    DECISION PAGE 3   9/5/06**

32

1   since you have been in custody, so that is something that

2   you should definitely be commended for.  You have only

3   had one 128, and that was back in 1996 for smoking.  You

4   have had -- you have taken some self-help.  You watched a

5   successfully -- successful reentry video, and that was in

6   November of 2003.  You have taken Life Skills, September

7   of '98.  Breaking Barriers in 1991.  You have had very

8   good work reports.  And you have been in PIA since

9   February of '93.  So you have definitely done some things

10  that you should be commended for.  However, these

11  positive aspects of your behavior does not outweigh the

12  factors of unsuitability.  In a separate Decision the

13  Hearing Panel finds that it is not reasonable to expect

14  that parole will be granted at a hearing during the

15  following four years.  So this is a four year denial.

16  For all the reasons I previously stated, and also because

17  the crime was very cruel and mean.  And the crime was

18  done without feeling bad about hurting others.  I think I

19  previously stated, this man was crying out and asking you

20  to stop, please stop stabbing him.  And you were out of

21  control where even the driver had to stop the car, pull

22  over off the freeway and just -- he got out the car and

23  ran because he feared for his life.  So the inmate did

24  not care if people suffered.  And, the victim was

25  definitely abused during the crime.  And the reason for

26  the crime was very small compared to the hurt it caused.

27  **SIMEON LUJAO   D-94153    DECISION PAGE 4    9/5/06**

33

1    This man lost his life.  His family lost his presence.

2    All because of a political conversation that you lost

3    control and became angry.  And the inmate has poor Parole

4    Plans.  I mean, basically, we don't have any -- any

5    letters of say -- letters of support whatsoever.  The

6    prisoner lacks a realistic Parole Plan in that he does

7    not have a viable residential plan.  He does not have

8    acceptable employment plans, and does not have a

9    marketable skill.  So, that is going to conclude the

10   reading of the Decision.  Deputy Commissioner McBean,

11   have you got anything to add?

12       **DEPUTY COMMISSIONER MCBEAN:**  I will just say one

13   more time -- how important it is for you to participate

14   in self-help.  I know other Panels have told you the same

15   thing.  The last time the Panel told you that you appear

16   to be wanting to do your own program, and I just

17   encourage you to take to heart the things the Board is

18   telling you today and please try to participate in

19   whatever self-help you can get into, and particularly

20   Anger Management.  And that -- that's it.

21       **PRESIDING COMMISSIONER PORTER:**  That is going to

22   conclude this hearing.  I wish you the best of luck, sir.

23       **ATTORNEY HURST:**  Put these back in file.

24       **INMATE LUJAO:**  All right.

25       **PRESIDING COMMISSIONER PORTER:**  Okay.

26       **DEPUTY COMMISSIONER MCBEAN:**  Thank you.  Good luck.

27   **SIMEON LUJAO   D-94153    DECISION PAGE 5    9/5/06**

34

1     **PRESIDING COMMISSIONER PORTER:**  Did he get a pink

2  copy?  A copy of the pink slip?

3     **ATTORNEY HURST:**  Oh, yes --

4     **INMATE LUJAO:**  Yes, right here.

5     **ATTORNEY HURST:**  -- it's right here.

6     **PRESIDING COMMISSIONER PORTER:**  Okay.

7     **INMATE LUJAO:**  Thank you.

8                          --o0o--

9  (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED FOUR YEARS**

24  **THIS DECISION WILL BE FINAL ON: <u>January 3, 2007</u>**

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **SIMEON LUJAO   D-94153    DECISION PAGE 6    9/5/06**

35

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SUSAN R. SHABAZZ-PARRISH, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total ONE in number and cover a total of pages numbered 1 - 34, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of SIMEON LUJAO, CDC No. D-94153, on SEPTEMBER 5, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 9, 2006, at Sacramento County, California.

SUSAN R. SHABAZZ-PARRISH
Transcriber
**VINE, MCKINNON & HALL**